# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| NICHOLAS KNOPICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 5:15-CV-005073 |
| | ) | |
| MARION COUNTY, ARKANSAS; | ) | |
| JOHN DOE (as Personal Representative of the | ) | |
| Estate of Roger Vickers); JOAN VICKERS | ) | |
| (in Her Official Capacity as Interim Sheriff of | ) | |
| Marion County, Arkansas); DEPUTY SHERFIFF | ) | |
| GEORGE CALDERIA (Individually and in | ) | |
| his Official Capacity); JODI BREEDLOVE; and | ) | |
| MICHAEL BREEDLOVE | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN OPPOSITION TO MARION COUNTY DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iii

Statement of the Case ................................................................................................... 1

Argument ...................................................................................................................... 7

    A.    Summary of Argument .......................................................................... 7

    B.    County Defendants violated Knopick's Fourth
           Amendment Rights ............................................................................... 7

          1.    Sheriff Vickers and Deputy Calderia actively participated
                in Mike and Jodi Breedlove's entry into the premises and
                seizure of property ........................................................................ 8

          2.    County Defendants violated the Fourth Amendment
                by approving and participating in the warrantless
                search and seizure ...................................................................... 12

          3.    County Defenants violated the Fourth Amendment by participating
                in the warrantless theft/seizure of Nick Knopick's computer ................... 14

          4.    Marion County is responsible for the actions of Sheriff Vickers .............. 15

    C.    Vickers and Calderia are not entitled to qualified immunity ................................. 16

    D.    As this case involved a private taking, rather than a taking for public
           use, Plaintiff was not required to exhaust state remedies, and his claim
           under the "takings clause" of the Fifth Amendment is not barred ......................... 21

Conclusion .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Atkinson v. City of Mt. View*,
  709 F.3d 1201 (8th Cir. 2013).................................................................15

*Bernini v. City of St. Paul*,
  665 F.3d 997 (8th Cir.2012) .................................................................16

*Dhalen v. Shelter House*,
  598 F.3d 1007 (8th Cir. 2010) .................................................................22

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982).................................................................16

*Jones v. Gutschenritter*,
  909 F.2d 1208 (8th Cir. 1990).................................................................11, 20

*Ker v. California*,
  374 U.S. 23 (1963).................................................................17

*Knopick v. Breedlove*,
  No. 3:11-CV-03010, 2013 WL 5806352 (W.D. Ark. Oct. 29, 2013)..........................7

*Kyllo v. United States*,
  533 U.S. 27 (2001).................................................................12

*McKenzie v. City of White Hall*,
  112 F.3d 313 (8th Cir.1997) .................................................................21

*Moore v. Carpenter*,
  404 F.3d 1043 (8th Cir. 2005) .................................................................18, 20

*Pearson v. Callahan*,
  555 U.S. 223 (2009).................................................................19

*Rogers v. Carter*,
  133 F.3d 1114 (8th Cir. 1998).................................................................12

*Samaad v. City of Dallas*,
  940 F.2d 925 (5th Cir.1991) .................................................................22

*Saucier v. Katz*,
  533 U.S. 194 (2001).................................................................19

*Showers v. Spangler*,
  182 F.3d 165 (3d Cir. 1999)...............................................................14

*Skinner v. Ry. Labor Executives' Ass'n*,
  489 U.S. 602 (U.S. 1989)....................................................................8

*Soldal v. Cook County*,
  506 U.S. 56 (U.S. 1992)................................................................12, 17

*Thompson v. City of Clio*,
  765 F. Supp. 1066 (M.D. Ala. 1991) ..................................................15

*Thompson v. Consol. Gas Utilities Corp.*,
  300 U.S. 55 (1937)............................................................................22

*U.S. v. Place*,
  462 U.S. 696 (1983) ....................................................................14, 15

*United States v. Jacobsen*,
  466 U.S. 109 (1984)....................................................................12, 15

*Welsh v. Wisconsin*,
  466 U.S. 740 (1984)..........................................................................12

**STATEMENT OF THE CASE**

Mike Breedlove and Nick Knopick entered into a contract on June 1, 2009. Jodi Breedlove Dep. (Ex. "B")[1], Ex 1 pp. 1-8. According to the contract, Nick Knopick ("Lessor") would permit Mike Breedlove ("Lessee") to operate Bull Shoals Hardware Store, which Knopick owned. Knopick leased the property to Mike Breedlove for $6,000 per month with an additional $48,000 due at the end of the 12 month lease term, for a total rent of $120,000. Jodi Breedlove Dep. (Ex. "B"), Ex 1 p. 1. The lease term began on July 1, 2009, and ended on July 1, 2010. Jodi Breedlove Dep. (Ex. "B"), Ex 1 p. 1. Rent payments were due on the first day of every month. Jodi Breedlove Dep. (Ex. "B"), Ex 1 p. 1.

According to Mike Breedlove, he only paid Nick Knopick $27,820 in February 2010 and then another payment of $32,800 in July 2010 for a total payment of $60,620, much less than the $120,000 due under the contract. Mike Breedlove Dep. (Ex. "F") 31:11-32:8, Jodi Breedlove Dep. (Ex. "B") 40:2-41:6. But Nick Knopick agreed to let Mike Breedlove continue to operate the store for a reduced rent of $5,000 per month. Mike Breedlove Dep. (Ex. "F") 33:2-5.

However, Mike Breedlove did not make any rent payments for the months of July or August 2010, due on July 1st and August 1st, respectively. Mike Breedlove Dep. (Ex. "F") 33:15-22. Nick Knopick and Mike Breedlove mutually agreed that the business relationship had ended Saturday, August 21, 2010, at noon. Knopick Dep. (Ex. "A") 78:13-15.  Both agreed that the rent for the month of August would be prorated as of the 21st so that Mike Breedlove would not have to pay rent for the last 10 days of the month. Knopick Dep. (Ex. "A") 78:13-15.

The contract provides, "On termination of this lease in course or by Lessor's action, Lessee shall surrender the leased premises..." Jodi Breedlove Dep. (Ex. "B") 22:16-21; Jodi

---

[1] All exhibits referenced herein are attached to Plaintiff's Statement of Facts (ECF No. 50).

Breedlove Dep. (Ex. "B"), Ex 1 p. 5. On Sunday, August 22, 2010, Nick Knopick informed Mike Breedlove that he would secure the store that day, and Mike Breedlove agreed. Knopick Dep. (Ex. "A") 34:5-13, 90:5-11. Knopick locked up the building while Bull Shoals Police Department Officer Gary Payton did a civil stand-by. Payton Dep. (Ex. "G") 6:4-9. Specifically, with Officer Payton present, Knopick chained the front doors and changed the locks on the back doors. Knopick Dep. (Ex. "A") 12:23-13:9; 36:12-14. Officer Payton obtained the prior approval of Bull Shoals Chief of Police Dave Hotchkiss and Prosecuting Attorney Kenford Carter. Payton Dep. (Ex. "G") 7:4-11, 8:10-13.

Mike Breedlove's father-in-law, Steve Broskovac, still had tools left in the back of the store because Broskovac had been doing repair work there. Knopick Dep. (Ex. "A") 37:16-18. Nick Knopick and Mike Breedlove had agreed that, on Monday afternoon or Tuesday, Knopick would allow Steve Broskovac to return to work for the remainder of the week to complete any unfinished repairs. Knopick Dep. (Ex. "A") 37:20-24, 39:15-22, 52:6-22, 78:15-21. Steve Broskovac also agreed to return Tuesday to finish repairs. Knopick Dep. (Ex. "A") 90:20-91:9, 92:7-13. In none of these conversations did Mike Breedlove state that he had left personal items in the store. Knopick Dep. (Ex. "A") 38:10-23, 52:11-22. In trying to arrange an exact time, however, Mike Breedlove stopped returning Nick Knopick's calls. Knopick Dep. (Ex. "A") 54:11- 24, 91:19-23.

Monday morning (August 23, 2010), Mike Breedlove told his boss, Public Works Director Bill Stahlman, that he was locked out of the business. Stahlman Dep. (Ex. "H") 7:15-17. Stahlman called Sheriff Vickers and told Vickers that Knopick had locked Mike Breedlove out of the hardware store. Stahlman Dep. (Ex. "H") 8:23-9:3; Mike Breedlove Dep. (Ex. "F") 52:11- 53:3. Stahlman said that Mike Breedlove "needed to get into the store" and asked for

help. Vickers Dep. (Ex. "I") 34:11-13.

Mike Breedlove then called Sheriff Vickers and told him personally that Nick Knopick locked him out of the store and that he needed to get some things out of the store. Mike Breedlove Dep. (Ex. "F") 54:13-21. The sheriff told Mike Breedlove, "We'll let you get your stuff." Mike Breedlove Dep. (Ex. "F") 57:2-3. Sheriff Vickers ordered Deputy Sheriff Calderia to meet Mike Breedlove at the store and to help Mike Breedlove get into the locked building. Knopick Dep. (Ex. "A") 46:1-2.

Sheriff Vickers claimed that Nick Knopick had wrongfully evicted Mike Breedlove, believing Knopick violated statutory notice requirements. Vickers now admits that an eviction could be done by agreement. Vickers Dep. (Ex. "I") 12:24-25. As prosecutor Kenford Carter recognized, "there are notice requirements which can be changed by the specific terms of the lease if there is a lease involved." Carter Dep. (Ex. "J") 17:19-21. Yet Sheriff Vickers never read the lease or asked to read the lease, which required the lessee to surrender the premises upon termination. Vickers Dep. (Ex. "I") 17:2-17; Jodi Breedlove Dep. (Ex. "B") 22:16-21; Jodi Breedlove Dep. (Ex. "B"), Ex A p. 5.

When Calderia arrived at the hardware store, Mike Breedlove told him that Nick Knopick had locked the Breedloves out of the building. Calderia Dep. (Ex. "D") 10:15-18. Steve Broskovac told Deputy Sheriff Calderia that they could unscrew a weather strip off of the back door to get around the door lock. Broskovac Dep. (Ex. "C") 15:24-16:17; Calderia Dep. (Ex. "D") 12:11-14:4. Deputy Sheriff Calderia "came around" and looked at how Broskovac would break into the building. Broskovac Dep. (Ex. "C") 16:13-17.

Deputy Sheriff Calderia was concerned with the idea of letting people enter a locked building. Calderia Dep. (Ex. "D") 14:5-8. Calderia called prosecutor Kenford Carter and told

3

him that Nick Knopick had locked the Breedloves out of the building. Carter Dep. (Ex. "J") 11:4-13. Calderia informed the prosecutor that "everybody was outside the building conversing about what was going to happen next." Carter Dep. (Ex. "J") 7:17-24. The prosecutor told Calderia to "[t]alk to your supervisors and make your own decision about what to do…" Carter Dep. (Ex. "J") 8:6-15.

Calderia then called Sheriff Vickers and told him that they were locked out of the building and asked the sheriff "what he wanted me to do next." Calderia Dep. (Ex. "D") 11:4-6; Vickers Dep. (Ex. "I") 15:6-17. Calderia told Vickers "that they would have to make other arrangements to get into the building." Vickers Dep. (Ex. "I") 15:18-20. Specifically, Calderia told Vickers that Mike Breedlove would unscrew a weather strip on the back door to get around the lock. Vickers Dep. (Ex. "I") 16:8-13, 17:18-23. Vickers told Calderia to "let Mike and them go ahead…" Calderia Dep. (Ex. "D") 11:23-25.

Deputy Sheriff Calderia then returned to Mike Breedlove and "said that was all right" to unscrew the weather stripping to break into the building. Broskovac Dep. (Ex. "C") 16:13-17. With Calderia's blessing, Steve Broskovac then did exactly that and removed the weather stripping with a cordless drill to get around the door lock. Broskovac Dep. (Ex. "C") 15:24-16:17; Calderia Dep. (Ex. "D") 12:11-14:4; 62:22-25.

According to Broskovac, they went to Deputy Sheriff Calderia each time they removed an item from the store, and Calderia would write down what they took. Broskovac Dep. (Ex. "C") 19:7-9. Calderia said, "This is going to work this way. You're not removing anything that doesn't come by me." Mike Breedlove Dep. (Ex. "F") 63:7-13. Among the items removed, Jodi Breedlove took Nick Knopick's laptop. Jodi Breedlove Dep. (Ex. "B") 60:22-62:20. When taking the laptop, Jodi Breedlove told Deputy Sheriff Calderia that it did not belong to her and that it

actually belonged to Nick Knopick. Jodi Breedlove Dep. (Ex. "B") 60:25-61:9, 77:15-25.

Later that day, Nick Knopick came by the store to discover people "loot[ing]" the hardware store and placing items into cars, trucks, and trailers. Knopick Dep. (Ex. "A") 43:25-44:20; 46:5-7. Knopick went to the office of Bull Shoals Mayor Bruce Powell and said to the mayor, "What are you going to do about this? … The sheriff is over at the hardware store taking stuff out of the building." Powell Dep. (Ex. "K")  8:11-16. The mayor explained that the City of Bull Shoals would not intervene to help Nick Knopick because the Sheriff's Department supersedes the City's authority. Powell Dep. (Ex. "K") 8:11-9:6, 9:17-19.

The mayor told Bull Shoals Police Officer John Thompson to not get involved. Thompson Dep. (Ex. "E") 6:8-14, 7:3-7. Nick Knopick then came to Officer Thompson very frantic and said, "They're taking stuff out of my building." Thompson Dep. (Ex. "E") 7:16-21. Officer Thompson and Nick Knopick went to the store. Thompson Dep. (Ex. "E") 7:21-22. Knopick recognized that Deputy Sheriff Calderia "was obviously the one in charge." Knopick Dep. (Ex. "A") 45:24. Knopick approached Calderia and voiced concerns over what was going on. Knopick Dep. (Ex. "A") 44:24-45:1.

Calderia said, "I was instructed by the sheriff to come down here and let these people in." Knopick Dep. (Ex. "A") 46:1-2. Knopick questioned what was going on, asked why no one called him, and asked for paperwork on what was going on. Knopick Dep. (Ex. "A") 46:3-4. Others there could tell that Knopick "was pretty angry." Jodi Breedlove Dep. (Ex. "B") 76:17-22, 96:24. Knopick asked, "How can this happen?" and, "What's going on?" Knopick Dep. (Ex. "A") 47:2-3. Calderia said, "I've got authority," and that he was "under orders." Knopick Dep. (Ex. "A") 46:21, 47:3-4. Knopick told Officer Thompson that he thought they were witnessing a theft. Knopick Dep. (Ex. "A") 47:8-10. But when asked if he could do anything, Thompson

replied, "I don't have any authority." Knopick Dep. (Ex. "A") 47:16-17. Knopick couldn't recall

whether he specifically told the sheriff's deputy to make them stop because, in his mind, he

thought, "I'm helpless," and "[t]here was no need." Knopick Dep. (Ex. "A") 46:9, 46:18-25.

Knopick recalled:

> So I'm not going to question authority at that point when I've got a local
> policeman right beside me not doing anything. How am I going to supersede both
> of those?

Knopick Dep. (Ex. "A") 47:5-7. Knopick reiterated, "I didn't know what options if any I had at

that point." Knopick Dep. (Ex. "A") 48:11-12.

During the 10-20 minute conversation, Calderia was facing away from the people taking

things in and out of the building. Thompson Dep. (Ex. "E") 7:23-25, 13:1-11, 18:4-13; Knopick

Dep. (Ex. "A") 48:21-49:1. Nick Knopick and Officer Thompson later entered the building and

Knopick showed the officer that they stole money out of the register and his laptop computer.

Thompson Dep. (Ex. "E") 11:16-12:2.

Nick Knopick called Sheriff Vickers the following day, August 24th. Vickers Dep. (Ex.

"I") 20:7-12. In that conversation, Knopick told Vickers that the Breedloves had stolen his

computer and provided proof of purchase. Vickers Dep. (Ex. "I") 21:7-21. Nevertheless, Vickers

took no action in the face of the theft. Vickers Dep. (Ex. "I") 21:24-25. Afterwards, the sheriff

received a complaint that the Breedloves used the stolen computer to print off business account

statements that they used to obtain money for a business they no longer owned. Vickers Dep.

(Ex. "I") 23:3-24:8. But the sheriff took no action to investigate the allegation. Vickers Dep.

"I") 23:10-12, 24:9-10.

The contract provides that, "At any time should this Lease terminate, the business

account(s) shall remain the property of the Lessor." Jodi Breedlove Dep. (Ex. "B"), Ex A p. 2.

Nevertheless, Mike and Jodi Breedlove used Nick Knopick's laptop to print off bills. Mike

Breedlove Dep. (Ex. "F") 65:21-66:4; Jodi Breedlove Dep. (Ex. "B") 64:9-65:5. They used the printed bills to collect money from hardware store customers. Mike Breedlove Dep. (Ex. "F") 66:4-15; Jodi Breedlove Dep. (Ex. "B") 65:13-15. They put the money they obtained into a new, separate bank account. Jodi Breedlove Dep. (Ex. "B") 65:21-23.

## ARGUMENT

### A.    Summary of Argument

Marion County, Arkansas, Joan Vickers, in her official capacity as interim sheriff of Marion County, Arkansas, and deputy sheriff George Calderia, individually and in his official capacity (collectively "Marion County Defendants"), ask this Court to grant summary judgment on following bases: (1) that Knopick cannot prove, as a matter of law, that the County Defendants violated his Fourth Amendment rights; (2) that Knopick's claim under the takings clause of the Fifth Amendment is not ripe for adjudication; and (3) that the claims against the individuals are barred by the doctrine of qualified immunity.  In a previous case, Judge P.K. Holmes, III, addressed the Fourth Amendment and qualified immunity arguments, in denying the County Defendants' Motion for Summary Judgment. (*See Knopick v. Breedlove*, No. 3:11-CV-03010, ECF No. 63, 2013 WL 5806352 (W.D. Ark. Oct. 29, 2013).)  For the reasons stated in Judge Holmes's Order, as well as those stated hereinbelow, this Court should deny the Marion County Defendants' Motion for Summary Judgment.

### B.    County Defendants violated Knopick's Fourth Amendment rights.

Relying on the fact that Deputy Sheriff Calderia never entered the hardware store, County Defendants deny that they conducted any search or seizure of Nick Knopick's property. However, County Defendants authorized and participated in the forced entry into Nick Knopick's business. In addition, County Defendants authorized and participated in the taking of

property from Nick Knopick's business, including the theft of at least one item that Deputy Sheriff Calderia knew belonged to Nick Knopick (a laptop).

1.    **Sheriff Vickers and Deputy Sheriff Calderia actively participated in Mike and Jodi Breedlove's entry into the premises and seizure of property.**

As the cases cited by Defendants evidence, whether a government actor engages in state action when involved with a repossession turns on whether the government actor is actively or passively involved in the repossession. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615 (U.S. 1989) (private railroad's breath and urine tests constituted state action because government had active, not passive role). In this case, Sheriff Vickers and Deputy Sheriff Calderia were actively involved in the forced entry into Nick Knopick's property and the removal of personal property from the building, including the theft of his laptop computer.

Causation is simple. At each step in the process, private citizens asked Sheriff Vickers and Deputy Sheriff Calderia what they should do. Every time, the County Defendants told the private citizens to proceed and that the County Defendants would help them do it.

Sheriff Vickers and Deputy Sheriff Calderia actively participated in the breaking and entering into Nick Knopick's hardware store. Sheriff Vickers knew from the get-go that Nick Knopick had locked the building and that Mike Breedlove wanted to break in. Stahlman Dep. (Ex. "H") 8:23-9:3; Mike Breedlove Dep. (Ex. "F") 52:11-53:3, 54:13-21; Vickers Dep. (Ex. "I") 34:11-13. Without the sheriff's approval, Mike Breedlove would not have entered the building. The sheriff told Mike Breedlove, "We'll let you get your stuff." Mike Breedlove Dep. (Ex. "F") 57:2-3. Sheriff Vickers ordered Deputy Sheriff Calderia to meet Mike Breedlove at the store and to help Mike Breedlove get into the locked building. Knopick Dep. (Ex. "A") 46:1-2.

Calderia knew the building was locked upon arrival. Calderia Dep. (Ex. "D") 10:15-18. When asked if they could break in by removing the screwed-in weather stripping, Broskovac

Dep. (Ex. "C") 15:24-16:17; Calderia Dep. (Ex. "D") 12:11-14:4, Deputy Sheriff Calderia "came around" and looked at how they would do it. Broskovac Dep. (Ex. "C") 16:13-17. Calderia was concerned with the idea of breaking into the building. Calderia Dep. (Ex. "D") 14:5-8. Calderia called a local prosecutor and said that "everybody was outside the building conversing about what was going to happen next." Carter Dep. (Ex. "J") 7:17-24. No one would have broken into the building without Calderia's permission.

Calderia then called Sheriff Vickers and told him that they were locked out of the building and asked the sheriff "what he wanted me to do next." Calderia Dep. (Ex. "D") 11:4-6; Vickers Dep. (Ex. "I") 15:6-17. Calderia told Vickers how Mike Breedlove would break in. Vickers Dep. (Ex. "I") 16:8-13, 17:18-23. Vickers told Calderia to "let Mike and them go ahead…" Calderia Dep. (Ex. "D") 11:23-25. Calderia explained, "I was instructed by the sheriff to come down here and let these people in." Knopick Dep. (Ex. "A") 46:1-2. Deputy Sheriff Calderia then returned to Mike Breedlove and "said that was all right" to break into the building. Broskovac Dep. (Ex. "C") 16:13-17.

With Calderia's blessing, Mike Breedlove did just that. Broskovac Dep. (Ex. "C") 15:24-16:17; Calderia Dep. (Ex. "D") 12:11-14:4; 62:22-25. Calderia then actively participated in the removal of property from the building. As Knopick noticed upon arrival, Calderia "was obviously the one in charge." Knopick Dep. (Ex. "A") 45:24. Calderia kept a log of items going out. Broskovac Dep. (Ex. "C") 19:7-9. Calderia said, "This is going to work this way. You're not removing anything that doesn't come by me." Mike Breedlove Dep. (Ex. "F") 63:7-13. Of particular importance, Calderia approved the theft of Nick Knopick's laptop even after being told that it belonged to Nick Knopick. Jodi Breedlove Dep. (Ex. "B") 60:25-61:9, 77:15-25.[2]

---

[2] The sheriff's actions following the breaking and entering show a preferential treatment that

Knopick did not discover until later that day that they stole money out of the register and his laptop computer. Thompson Dep. (Ex. "E") 11:16-12:2. No one would have removed any item, including Nick Knopick's laptop, without Calderia's permission.

In addition, the City of Bull Shoals would not intervene *because of the County Defendants' involvement*. It is significant to note, that just one day prior to the break-in, a Bull Shoals officer did a civil stand-by while Nick Knopick locked the store. Payton Dep. (Ex. "G") 6:4-9; Knopick Dep. (Ex. "A") 12:23-13:9; 36:12-14. The officer had the prior approval of his police chief and a local prosecutor. Payton Dep. (Ex. "G") 7:4-11, 8:10-13. But when Knopick asked Bull Shoals Mayor Bruce Powell for help on the day of the break-in, the mayor explained that he could not intervene because the County Defendants supersede his authority. Powell Dep. (Ex. "K") 8:11-9:6, 9:17-19. For this reason, the mayor told Bull Shoals Police Officer John Thompson to not get involved. Thompson Dep. (Ex. "E") 6:8-14, 7:3-7. So when Knopick frantically asked Officer Thompson for help, Thompson Dep. (Ex. "E") 7:16-21; Knopick Dep. (Ex. "A") 47:8-10, the officer replied, "I don't have any authority." Knopick Dep. (Ex. "A") 47:16-17.

Moreover, Knopick did not physically attempt to stop Mike Breedlove's actions because of Deputy Sheriff Calderia's presence. Knopick voiced concerns to Calderia about what was going on, asked why no one called him, and asked for paperwork on what was going on. Knopick Dep. (Ex. "A") 44:24-45:1, 46:3-4. Knopick asked, "How can this happen?" Knopick Dep. (Ex. "A") 47:2-3. Others there could tell that Knopick "was pretty angry." Jodi Breedlove

---

belies reasonableness. Nick Knopick not only told Sheriff Vickers that the Breedloves had stolen his computer, but provided proof of purchase. Vickers Dep. 21:7-21. Nevertheless, Vickers took no action in the face of the theft. Vickers Dep. 21:24-25. Afterwards, the sheriff received a complaint that the Breedloves used the stolen computer to print off business account statements that they used to obtain money for a business they no longer owned. Vickers Dep. 23:3-24:8. But the sheriff took no action to investigate the allegation. Vickers Dep. 23:10-12, 24:9-10.

pm

Dep. (Ex. "B") 76:17-22, 96:24. Calderia said, "I've got authority," and that he was "under

orders." Knopick Dep. (Ex. "A") 46:21, 47:3-4.

Knopick thought, "I'm helpless." Knopick Dep. (Ex. "A") 46:9, 46:18-25. Knopick

recalled, "So I'm not going to question authority at that point when I've got a local policeman

right beside me not doing anything. How am I going to supersede both of those?" Knopick Dep.

(Ex. "A") 47:5-7. Knopick reiterated, "I didn't know what options if any I had at that point."

Knopick Dep. (Ex. "A") 48:11-12.

In a similar case, *Jones v. Gutschenritter*, 909 F.2d 1208, 1212-1213 (8th Cir. 1990), the

Eighth Circuit found sufficient evidence of state action:

> [T]here is an issue for a trier of fact as to whether Officer Thompson was assisting
> in effectuating the disconnection of Jones' electrical service over the objection of
> Jones or so intimidated him as to cause him to refrain from exercising his legal
> right to resist the disconnection. We believe that a jury could find from these facts
> more than mere acquiescence or standing by in case of trouble. It is true that there
> was no direct confrontation or exchange of words between Thompson and Jones.
> On the other hand, Larsen made clear that an officer was summoned because of
> threats that Jones had made earlier and because of Larsen's fear that Jones was
> armed. Officer Thompson entered the building, went to the electrical service box,
> and stood a few feet away from Larsen while Larsen disconnected Jones' electrical
> service. Thompson saw Jones as he walked down the hallway with Larsen toward
> Jones' electrical service box and, more importantly, Jones had seen Thompson,
> uniformed and armed, pass by with Larsen and proceed to the electrical service
> box where he heard the voices of the two before the electricity went off.
> Thompson neither departed before the disconnection of the utilities … nor
> engaged in direct, verbal confrontation ….
>
> There was evidence that had the officer not been present Jones would have taken
> action to protect his rights… We believe that it was for the jury to determine
> whether the close proximity of Officer Thompson to Larsen when he disconnected
> Jones' electrical services could have engendered fear or intimidation, that the jury
> could have concluded that Officer Thompson was not simply present and standing
> by, but rather was lending police intervention and aid in the disconnection of
> Jones' electrical services, and that Thompson's action constituted state action.

As in *Jones*, viewing the evidence and all inferences in favor of Nick Knopick, (1) Mike

Breedlove would not have forced entry into the store without County Defendants' permission,

(2) Jodi Breedlove would not have stolen Nick Knopick's laptop without County Defendants' permission, (3) the City of Bull Shoals would have intervened to protect Nick Knopick's property were it not for County Defendants' actions, and (4) Nick Knopick would have physically stopped the theft were it not for County Defendants' actions. Therefore, this Court should deny County Defendants' motion for summary judgment.

2. **County Defendants violated the Fourth Amendment by approving and participating in the warrantless search and seizure.**

As explained above, Sheriff Vickers and Deputy Sheriff Calderia actively participated in the forced entry into Nick Knopick's store. This violated the Fourth Amendment.

Under the Fourth Amendment, "[a] 'seizure' of property … occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook County*, 506 U.S. 56, 61 (U.S. 1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). The Supreme Court has "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch,' was too much . . . ." *Kyllo v. United States*, 533 U.S. 27, 37 (2001). This is especially true in the case of "an extremely minor offense." *Rogers v. Carter*, 133 F.3d 1114, 1119 (8th Cir. 1998). *See also Welsh v. Wisconsin*, 466 U.S. 740, 752-54, 104 S.Ct. 2091, 2098-2100, 80 L.Ed.2d 732 (1984) ("it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor").

Although this case does not involve a home, the warrant requirement applies equally. The County Defendants had no judicial authorization to conspire with Mike Breedlove to break into the locked building. Accordingly, Sheriff Vickers violated the Fourth Amendment by ordering Deputy Sheriff Calderia to let Mike Breedlove into Nick Knopick's locked building. Calderia violated the Fourth Amendment by following the illegal order.

County Defendants argue that Nick Knopick wrongfully evicted Mike Breedlove. County Defendants miss the point of the Fourth Amendment. Even though (as will be explained) Nick Knopick broke no law, the Fourth Amendment protects even law breakers. It requires probable cause of a broken law ***and a warrant***. So the state law they cite is ultimately inapposite.

In any event, Nick Knopick followed the law because he and Mike Breedlove agreed to the termination of the business on Saturday, August 20, 2010, as well as the locking of the store on Sunday, August 21, 2010. Even Sheriff Vickers admits that an eviction could be done by agreement. Vickers Dep. (Ex. "I") 12:24-25. As prosecutor Kenford Carter recognized, "there are notice requirements which can be changed by the specific terms of the lease if there is a lease involved." Carter Dep. (Ex. "J") 17:19-21. Yet Sheriff Vickers never read the lease or asked to read the lease, which required the lessee to surrender the premises upon termination. Vickers Dep. (Ex. "I") 17:2-17; Jodi Breedlove Dep. (Ex. "B") 22:16-21; Jodi Breedlove Dep. (Ex. "B"), Ex A p. 5.

All of the statutes and cases cited by County Defendants deal with a tenant who refuses to leave the premises. In this case, on the other hand, Nick Knopick and Mike Breedlove mutually agreed that the business relationship had ended Saturday, August 21, 2010, at noon. Knopick Dep. (Ex. "A") 78:13-15. Both agreed that the rent for the month of August would be prorated as of the 21st so that Mike Breedlove would not have to pay rent for the last 10 days of the month. Knopick Dep. (Ex. "A") 78:13-15. The contract provides, "On termination of this lease in course or by Lessor's action, Lessee shall surrender the leased premises..." Jodi Breedlove Dep. (Ex. "B") 22:16-21; Jodi Breedlove Dep. (Ex. "B"), Ex 1 p. 5. Accordingly, on Sunday, August 22, 2010, Nick Knopick informed Mike Breedlove that he would secure the

store that day, and Mike Breedlove agreed. Knopick Dep. (Ex. "A") 34:5-13, 90:5-11. County Defendants cite no state law that prohibits parties' mutual agreement to end a contract and transfer property from a lessee to a lessor. Therefore, the County Defendants violated Nick Knopick's possessory interests when they helped a *former* tenant to break into his property.

> ### 3.      <u>County Defendants violated the Fourth Amendment by participating in the warrantless theft / seizure of Nick Knopick's computer.</u>

As explained above, Deputy Sheriff Calderia actively participated in the theft of Nick Knopick's laptop computer. This violated his possessory interest under the Fourth Amendment.

"The Fourth Amendment is designed to protect liberty, privacy, and possessory interests against arbitrary intrusion by the government." *Showers v. Spangler*, 182 F.3d 165, 172 (3d Cir. 1999). Specifically, "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, *and effects*, against unreasonable searches and seizures.'" *U.S. v. Place*, 462 U.S. 696, 700 (1983) (emphasis added by Supreme Court).

The Supreme Court has held that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal*, 506 U.S. at 68. In fact, generally, "a seizure of personal property [is] *per se* unreasonable ... unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *Place*, 462 U.S. at 701. In this case, the seizure/theft of Nick Knopick's laptop was *per se* unreasonable. As the County concedes, they had no warrant or probable cause.

Perhaps in their reply brief, the County Defendants will argue that the seizure of Nick Knopick's laptop was not that bad. Two Supreme Court cases and their progeny aid this analysis. In *Place*, 462 U.S. 696, the Supreme Court held that taking luggage from a person's

custody constitutes a seizure. The year after *Place*, in *U.S. v. Jacobsen*, 466 U.S. 109, 125 (1984), the Supreme Court found *de minimis* the destruction of a "trace amount" of powder "virtually certain" to be contraband. But the Court cautioned, "Of course, where more substantial invasions of constitutionally protected interests are involved, a warrantless search or seizure is  unreasonable in the absence of exigent circumstances." *Id.* at 125 n. 28. The Court continued,  "We do not suggest, however, that any seizure of a small amount of material is necessarily reasonable." *Id.*

Unlike in *Jacobsen*, Deputy Sheriff Calderia did not authorize the seizure of a trace of cocaine, he told people that they could take a computer that did not belong to them from the owner. *See Thompson v. City of Clio*, 765 F. Supp. 1066, 1073 (M.D. Ala. 1991) (seizure of tape recorder violated Fourth Amendment). Accordingly, the seizure was not *de minimis* and the Deputy Sheriff Calderia violated Nick Knopick's Fourth Amendment rights.

**4.       Marion County is responsible for the actions of Sheriff Vickers.**

As County Defendants admit, Marion County is responsible for the decisions of a final decision maker. Sheriff Vickers has final decision-making authority for Marion County as far as  law enforcement decisions are concerned. Vickers Dep. (Ex. "I") 7:18-24.

As explained above, Vickers knew Knopick had locked the building, but ordered a deputy to let Mike Breedlove break into the building. At no point did Vickers evidence even a hint on interest in Knopick's property rights. He didn't ask to see the lease or even ask that anyone notify Knopick of the government-sponsored break-in.

County Defendants rely on *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1216 (8th Cir. 2013), to argue that Sheriff Vickers did not act deliberately indifferent to Nick Knopick's rights. But that case is easily distinguished. There, the plaintiff made a bare allegation of

deliberate  indifference based upon the "the absence of a binding, written policy on the use of force." *Id.* The Eighth Circuit focused on the lack of notice to the municipality in finding no deliberate indifference. *Id.*

In this case on the other hand, a final policymaker (Sheriff Vickers) had actual knowledge that Nick Knopick had locked Mike Breedlove out of the hardware store. Vickers ordered a deputy to let Breedlove into the store without a warrant. Vickers had actual knowledge of how Breedlove would break into the locked building. The deputy was concerned, but Vickers ordered the deputy to let the people break into the building. Not once did Vickers contemplate reaching Nick Knopick, reviewing the lease, or securing a court-order to break into the building. When notified that Deputy Sheriff Calderia allowed Jodi Breedlove to steal Nick Knopick's laptop, Vickers appeared to care less. Vickers Dep. (Ex. "I") 21:7-21, 21:24-25, 23:3-24:10. Vickers' disinterest upon learning that he just facilitated a theft evidences his indifference towards Knopick's property rights. Therefore, this Court should not grant summary judgment to Marion County.

### C.      Vickers and Calderia are not entitled to qualified immunity.

"Qualified immunity shields a public official from suit for civil damages when his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Bernini v. City of St. Paul*, 665 F.3d 997, 1002 (8th Cir.2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Such immunity applies to police officers engaged in their official duties unless the evidence establishes (1) that a plaintiff's constitutional rights were violated, and (2) those rights were so clearly established at the time of the alleged violation that a reasonable officer would have known that his actions were unlawful. *Id.*

Here, Knopick asserts that his Fourth, Fifth, and Fourteenth Amendment rights were violated when private citizens forcibly entered his hardware store and seized his personal property. "The Fourth Amendment, made applicable to the States by the Fourteenth, provides in pertinent part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (citing *Ker v. California*, 374 U.S. 23, 30 (1963)). "A seizure of property ... occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* (internal citation and quotation marks omitted). "Whether the Amendment was in fact violated ... requires determining if the seizure was reasonable." *Id.* at 61–62.

The facts in this case show that Knopick was the owner of the hardware store, and he desired to immediately end his business relationship with the tenant and manager of the store, Mr. Breedlove. Knopick decided to chain and padlock the front doors of the store and change the locks on the back door without first allowing Mr. Breedlove to retrieve his personal property from the store. Knopick claims he did this because he felt he and Mr. Breedlove had reached a mutual agreement that their business relationship had ended, and consequently there was no need for Knopick to adhere to the usual state-law procedures governing evictions. Mr. Breedlove disagreed that he made any such agreement to waive the standard notice requirements required by state law prior to evicting a tenant.

Regardless of the legality of Knopick's actions, it appears Mr. Breedlove decided to take matters into his own hands, and with the help of multiple friends and family members, he ultimately created his own access into the hardware store despite the fact that the locks had been changed. He and others forced entry into the store by removing a piece of weather stripping from

17

a roll-up door in the back of the building. Mr. Breedlove and others then removed a number of items of personal property from the store, including some property that belonged to Knopick.

The only reason that the State is implicated in the acts of these private citizens is because Vickers, the County Sheriff, sent his deputy, Calderia, to the hardware store to be present and "stand by" while Mr. Breedlove removed his property. Vickers and Calderia claim they did not know ahead of time that Knopick had padlocked the store and changed the locks. They also claim they did not know Knopick would be absent when the civil standby began. Regardless of their assumptions, however, the question for the Court is whether Vickers and Calderia were so involved in Mr. Breedlove's forced entry into the store and removal of Knopick's property that this private action was transformed into state action implicating Knopick's constitutional rights.

The Eighth Circuit has determined that "[w]hen a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help." *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005) (internal citation omitted). Considering the facts in the light most favorable to Knopick, and giving Knopick the benefit of any inferences that logically can be drawn from those facts, the Court finds that there is at least a genuine dispute of material fact as to whether the Breedloves' manner of entry into the store and removal of property would not have occurred without Vickers and Calderia's help.

Assuming that state action occurred and Vickers and Calderia are exposed to liability for their involvement in the events at the hardware store, the next issue for the Court is whether they would be entitled to qualified immunity. In examining this issue, the Court must decide, first, whether the facts as Knopick has alleged amount to a violation of a constitutional right, and,

18

second, whether the right at issue was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The first prong of the analysis weighs in Knopick's favor, as Knopick's Fourth Amendment rights were implicated by the forced entry and search of Knopick's locked store and by the seizure of Knopick's property without a court order, warrant, or the presence of exigent circumstances. Vickers and Calderia contend that simply because Calderia did not physically assist the private actors in removing the weather stripping from the roll-up door or helping to haul items into the trucks and trailers waiting in the parking lot, no state action occurred. However, construing the facts in Knopick's favor, it is probable that none of the private actors at the scene would have attempted to enter the locked store but for Calderia's presence. Further, there is evidence that Mr. Breedlove and others waited for approval and encouragement from Calderia—who sought and obtained approval and encouragement from his superior, Vickers— before entering the store and removing items of personal property. Calderia admits he communicated his and Vickers' approval of Mr. Breedlove's plan to force entry into the building by nodding to Mr. Breedlove. Broskovac maintains that Calderia "said it was all right" to enter the store and remove property. For purposes of the qualified immunity analysis on summary judgment, there is sufficient evidence to find that Knopick's constitutional rights were violated due to the Vickers and Calderia's involvement in the unlawful entry of Knopick's store and seizure of his property.

The second prong of the qualified-immunity analysis asks whether Knopick's Fourth Amendment rights were clearly established at the time of the events in question, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Vickers and Calderia argue that because

Knopick did not observe the proper eviction processes mandated by state law, the Breedloves were justified in entering the hardware store in the manner in which they did and physically removing property from the store. The problem with this argument is that Knopick's alleged failure to observe state-law eviction processes does not justify the Breedloves' violation of Knopick's rights and the state actors' encouragement and approval of the Breedloves' actions. The Eighth Circuit has held that officers violate no law when they are called "to a scene not of their making only to resolve a breach of the peace that was in progress." *Moore*, 404 F.3d at 1046. However, it cannot be said beyond dispute in this case that the forced entry of the hardware store and removal of property was "not of Vickers and Calderia's making," nor can it be said that Vickers and Calderia behaved neutrally in response to a breach of the peace that was already in progress once Calderia arrived.

Viewing the facts in the light most favorable to Knopick, Vickers and Calderia gave permission to, if not actively encouraged, Mr. Breedlove and a number of other private citizens, including those they knew or should have known were not tenants of the store, to violate Knopick's constitutional rights by entering a locked commercial property. Moreover, Vickers and Calderia gave permission to, if not actively encouraged, various individuals to stream in and out of the store, removing personal property by the truckload, without determining these individuals' relationship to the owner of the store, examining any lease agreements, interviewing the landlord, or verifying that the property being removed actually belonged to those who were removing it. Though it is true that "mere acquiescence by the police to stand by in case of trouble is insufficient to convert a repossession into state action," *Jones v. Gutschenritter*, 909 F.2d 1208, 1212 (8th Cir.1990), in the case at bar, considering the facts in the light most favorable to Knopick, it would be clear to a reasonable officer in Vickers and Calderia's position that their

conduct was unlawful.

The qualified immunity defense cannot be salvaged simply by arguing that Vickers and Calderia were "never informed there was a problem while the items were being removed," "never asked to make a decision to stop the removal," or never "told that the Plaintiff's laptop was taken or that the Breedlove's [sic] did not have the lawful right to take it." If Knopick had a clearly established Fourth Amendment right to be secure in his real and personal property and not to have his property seized, then Vickers and Calderia should have known that allowing or encouraging the Breedloves to break into the store and remove property was unlawful. Because the qualified immunity defense is not available to Vickers and Calderia on these facts, their Motion for Summary Judgment should be denied.

> **D. As this case involves a private taking, rather than a taking for public use, Plaintiff was not required to exhaust state remedies, and his claim under the "takings clause" of the Fifth Amendment is not barred.**

Nick Knopick's claim against the County Defendants under the "takings clause" of the Fifth Amendment is ripe for adjudication. The County Defendants maintain that Knopick's § 1983 claims are not ripe, and therefore this Court lacks jurisdiction. County Defendants assert that a federal takings claim does not become ripe until the claimant has sought state remedies. In *McKenzie v. City of White Hall*, 112 F.3d 313, 317 (8th Cir.1997), a physical takings case, the Eighth Circuit stated that "the plaintiff must seek compensation from the state before proceeding to federal court if adequate state procedures are available ... [t]his is so because when the state provides an adequate process for obtaining compensation, no Fifth Amendment violation occurs until compensation is denied."

However, the cases cited by the County Defendants are inapposite because they involve government taking for public use, while Knopick alleges a taking for the benefit of a private

party. In *Thompson v. Consol. Gas Utilities Corp.*, 300 U.S. 55, 80, 57 S.Ct. 364, 81 L.Ed. 510 (1937), the Supreme Court held that private property "may not be taken for the benefit of another private person without a justifying public purpose." 300 U.S. at 80.

Moreover, in *Samaad v. City of Dallas*, the Fifth Circuit held that "plaintiffs' failure to seek compensation for the alleged taking of their property for a private purpose does not render that claim unripe." *Samaad v. City of Dallas*, 940 F.2d 925, 936–37 (5th Cir.1991). The Eighth Circuit has relied on *Samaad*, and therefore, there is no requirement that plaintiff exhaust state remedies before setting forth claims involving takings for private purposes.

In *Dhalen v. Shelter House*, 598 F.3d 1007 (8th Cir. 2010), the Eighth Circuit acknowledged its reliance on *Samaad* and held that if the plaintiffs could show that the taking was in fact a private taking, then state remedies need not be pursued, and their claim would be ripe for adjudication in federal court. *Dhalen*, 598 F.3d at 1011. In the instant case, viewing the facts in the light most favorable to Knopick, the taking was clearly private and not for public use, and as such, Knopick was not required to exhaust his state remedies before filing suit.

## CONCLUSION

For the foregoing reasons, this Court should deny County Defendants' Motion for Summary Judgment.

Date:  February 15, 2016

Respectfully submitted,
Nicholas Knopick, Plaintiff

By: */s/ Casey Castleberry*
M. Blair Arnold, ABA #78004
Kenneth P. "Casey" Castleberry, ABA #2003109
Bill Arnold. ABA #2013031
MURPHY, THOMPSON, ARNOLD,
 SKINNER & CASTLEBERRY
555 East Main Street, Suite 200

Post Office Box 2595
Batesville, Arkansas 72503
Telephone:  870-793-3821
Facsimile:  870-793-3815
mbarnold@swbell.net
caseycastleberry2003@yahoo.com
attorneybillarnold@gmail.com

Jeff H. Lehman, *pro hac vice*
Justin Johnson, *pro hac vice*
JEFF H. LEHMAN, P.C.
211 N. Record Street, Suite 450
Dallas, Texas 75202
Telephone:  (214) 748-0681
Facsimile:  (214) 742-7313
jeff.lehman@jhlpc.com

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system.  As such, this pleading was served on all counsel who are deemed to have consented to electronic service.  All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by regular mail on this 15th day of February, 2016

/ s / *Casey Castleberry*
Attorney

24